IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **No. 2:25-cr-00183-GAW-2** |
| | : | |
| **TYLER NICHOLS** | : | |
| | : | |

## MEMORANDUM

This Memorandum Opinion accompanies this Court's May 19, 2026 Order (Dkt. 187) denying Tyler Nichols' (Defendant) Motion for Judgment of Acquittal Pursuant to Federal Rule of Criminal Procedure 29 and Motion for a New Trial Pursuant to Federal Rule of Criminal Procedure 33 ("Motion," with citations that follow to the accompanying Memorandum of Law) (Dkt. 166).

By way of background, on January 14, 2026, after a weeklong trial before this Court, a jury found Defendant guilty of (1) a September 19, 2024 robbery of a Family Dollar, (2) using a firearm during that robbery, (3) a September 27, 2024 robbery of an AutoZone, (4) using a firearm during that robbery, (5) an October 6, 2024 attempted robbery of a Family Dollar, and (6) an October 11, 2024 attempted robbery of a Family Dollar. *See* Jury Verdict Form (Dkt. 143). Defendant now seeks a judgment of acquittal, or alternatively, a new trial.

### I.    Motion for Acquittal

Defendant first asks, pursuant to Federal Rule of Criminal Procedure 29, for a judgment of acquittal. He contends that the evidence introduced at trial was insufficient to sustain his convictions. Specifically, he alleges that the evidence did

not prove beyond a reasonable doubt that he committed the crimes in question, instead pointing only to his co-defendant, Dadisi Williams.[1] *See* Motion at 2–13. For the following reasons, Defendant's argument is without merit.

Under Rule 29, a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). District courts must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilty beyond a reasonable doubt based on the available evidence. A finding of insufficiency should be confined to cases where the prosecution's failure is clear." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (quotation marks and citations omitted). Moreover, "[c]ourts must be ever vigilant in the context of [Rule] 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *Id.* (citations omitted).

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found (and indeed did find) that the evidence proved Defendant's guilt beyond a reasonable doubt. The Government's recitation of the relevant evidence comports with both the record and this Court's recollection. *See* Government's Response in Opposition (Dkt. 169) 4–11. First, video of the charged offenses established that the same two individuals committed the crimes. *See* Exhibits 101, 102, 201, 202, 301, 401, 402, and 501. The perpetrators had a similar appearance and employed a similar *modus operandi*, with Mr. Williams locking the

---

[1]    Mr. Williams pleaded guilty to the above-mentioned charges. *See* Judgment as to Dadisi Williams, 2:25-cr-00183-GAW-1 (Dkt. 178).

doors, Defendant brandishing firearms, and Mr. Williams putting whatever cash they obtained into a bag.

The victims' testimony lent further support to a finding that the same perpetrators committed each offense. For example, victims noted the height difference between the two robbers, testifying that the man with the gun was taller. *See* Tr. 2 at 46:8–17; Tr. 2 at 114:5–8; Tr. 2 at 136:9–16, 145:13–21; Tr. 2 at 165:4–7; Tr. 2 at 184:2–7. This was consistent with the height difference between Defendant and Mr. Williams. *See* Exhibits 601–604 (establishing Defendant's height was between 5 foot, 7 inches, and 5 foot, 9 inches, and Mr. Williams' was 5 foot, 3 inches). Additionally, the multiple victims heard a police scanner coming from the robbers. *See* Tr. 2 at 63:15–64:13; Tr. 2 at 91:8–21; Tr. 2 at 106:12–15; Tr. 2 at 128:22–129:14. The robbers often inquired about the safes in the stores. *See* Tr. 2 at 46:18–47:18; Tr. 2 at 104:20–25; Tr. 2 at 124:20–125:8; Tr. 2 at 164:8–13. The victims testified the race of the perpetrators matched the race of Mr. Williams and Defendant. *See* Tr. 2 at 45:21–46:7; Tr. 2 at 87:17–23; Tr. 2 at 103:22–23; Tr. 2 at 134:25–135:5; Tr. 2 at 155:18–23.

Certainly, these descriptions could conceivably be common to robberies committed by different individuals. Nevertheless, the testimony did not contradict—and indeed provided further support for—the jury's reasonable inference that the charged offenses were committed by the same individuals. Moreover, although Defendant highlights certain discrepancies in the heights and ages of the perpetrators, *see* Motion at 4–5, they were not so incongruous as to preclude a

reasonable factfinder from concluding that the different witnesses were still describing the same people. The witnesses' descriptions were only inaccurate by a few years or a few inches. Furthermore, the imprecise estimates of age could be further explained by the fact that the perpetrators were wearing ski masks.

Turning to physical evidence, a search of Defendant's home yielded a "Champion" hat with a distinctive sticker that matched the hat worn in the September 27, 2024 AutoZone robbery. *See* Exhibits 409, 605, 606, and 608. On his phone, Defendant had a photograph of him wearing a "Rockstar Dist." hat and sweatshirt with "splatter paint" designs. *See* Exhibits 611 and 612. These matched the hat and sweatshirt Defendant wore during the September 19, 2024 Family Dollar robbery. *See* Exhibit 103. The photographs also showed Defendant wearing tan boots similar to the boots Defendant wore in the October 6, 2024 attempted robbery. *See* Exhibit 304. The black and white Nike sneakers Defendant was wearing in another photograph are similar to the shoes wore by Defendant in the other three charged incidents. *See* Exhibits 103, 205, 408, 613. Finally, there is a photograph of Defendant wearing a white hard hat similar to the hat Defendant wore in the September 27, 2024 robbery. *See* Exhibit 205, 614.

The evidence also included cell site location information that further suggested Defendant's guilt. An expert witness testified that both Defendant's and Mr. Williams' phones were using the same cell tower at the time of the September 19, 2024 robbery. *See* Tr. 3 at 201:17–22. During the September 27, 2024 robbery, testimony established that both phones were again using the same cell tower within

the 90 minutes prior to the robbery. *See* Tr. 3 at 202:7–22, Exhibit 707. About 80 minutes before the robbery, Defendant's phone was moving away from the area of Mr. Williams' home and towards the area of the robbery, followed by a period with no additional location records. *See* Tr. 3 at 202:23–203:14, Exhibit 707. Thirty minutes prior to the attempted robbery on October 6, 2024, Defendant's and Mr. Williams' phones were again in the same area and within a "drivable" distance to the crime scene. *See* Tr. 3 at 240:14–25; Tr. 3 at 241:10–19; Tr. 3 at 242:5–13; Tr. 3 at 245:10–25. For the October 11, 2024 attempted robbery, Defendant's phone was in the area of the crime scene four hours before the robbery, but there was no mappable data through the time of the robbery. *See* Tr. 3 at 205:15–22; Exhibit 707. After the attempted robbery, both Defendant's and Mr. Williams' phones moved to the area of Mr. Williams' home. *See* Tr. 3 at 206:1–14; Exhibit 707. As the Government correctly observes, this data allowed a reasonable factfinder to infer that "on some occasions [they] left their phones at [Mr.] Williams' home at the time of the robberies, [and] on other occasions … they had their phones either with them, or with them and turned off or in airplane mode" so no location records were created. Government's Response at 8.

There was also evidence in the form of text messages from Defendant. He referenced a Glock, and one victim testified he thought the gunman had two Glocks. *See* Exhibit 615; Tr. 2 at 105:24–106:1. The evening police found Mr. Williams with the vehicle linked to the robberies, Defendant sent messages to someone stating, "Yea

I'm good my man boutta get booked for some shit[,]" "Bro ima explain it to u but I'm involved[,]" and "Might gotta get lo too many ppl around to explain." *See* Exhibit 621.

Messages between Defendant and Mr. Williams showed their shared intent: They discussed insurance and registration for the vehicle used in some of the incidents several days before the first robbery. *See* Tr. 4 at 74:9–75:10. On a day between the first and second robberies, Defendant asked Mr. Williams if he had the other "gat," which the testifying FBI agent explained meant a gun. Tr. 4 at 77:19–78:16. Mr. Williams sent Defendant a Google Maps link to the Family Dollar the day before they attempted to rob it. *See* Tr. 4 at 79:6–16. On October 11, 2024, the day Defendant and Mr. Williams attempted to rob a Family Dollar, Defendant texted Mr. Williams to ask, "[w]hat time we sliding[,]" and Mr. Williams responded with pictures of the AutoZone they had previously robbed. Tr. 4 at 82:11–84:18. Mr. Williams then explained there was no manager present at the AutoZone to open the safe. *See* Tr. 4 at 83:21–25. Mr. Williams sent a picture of a victim from the previous AutoZone robbery, who was also working on October 11th, and they discussed how that victim had run into the bathroom during the previous robbery. *See* Tr. 4 at 84:14–86:7. Defendant also texted, "But ayo I need some cheese bro. I'm ready to stick um anyway." Tr. 4 at 86:11–15. The testifying FBI agent explained "cheese" meant money. Tr. 4 at 86:16–21.

Lastly, when police searched the vehicle linked to the offenses, they recovered, among other things, a police scanner (Exhibit 511), a ski mask similar to those worn

during the robberies (Exhibit 512), and a reflective work vest resembling one worn during a robbery (Exhibit 514).  *See* Tr. 3 at 97:15–109:24.

Taken together and viewed in the light most favorable to the Government, this evidence was sufficient to sustain Defendant's convictions.  Therefore, his motion for a judgment of acquittal was properly denied.

## II.    Motion for a New Trial

Alternatively, Defendant asks for a new trial pursuant to Rule 33, which provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "[T]he decision whether to grant a new trial or a hearing on that motion rests in the district court's discretion."  *United States v. Noel*, 905 F.3d 258, 270 (3d Cir. 2018) (footnote and citation omitted).  Defendant seeks a new trial for three reasons.  The Court now addresses each in turn.

### 1.  Weight of the Evidence

Defendant avers that, "[f]or the same reasons set forth in [his] Rule 29 motion, … the verdict in this case is inconsistent with the weight of the evidence.  Most of the physical evidence in this case points to Mr. Williams."  Motion at 14.

"A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted."  *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014) (citation and quotation marks omitted).  Accordingly, "[m]otions for a new trial based on the

weight of the evidence are not favored.  Such motions are to be granted sparingly and only in exceptional cases." *Id.* (citation and quotation marks omitted).  Unlike a Rule 29 sufficiency challenge, "[w]hen evaluating a Rule 33 motion, the district court does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *Id.* (citation and quotation marks omitted).

This Court presided over Defendant's weeklong trial and had ample opportunity to assess the Government's case.  As detailed above, there was substantial evidence in this case, sufficient to prove beyond a reasonable doubt that Defendant perpetrated the offenses with which he was charged.  In this Court's view, there is no serious danger that a miscarriage of justice has occurred or that an innocent person has been convicted.  Thus, the jury's verdict was not contrary to the weight of the evidence, and this is not the sort of exceptional case meriting a new trial.

   2.   Admission of Defendant's Text Messages

Next, Defendant "contends that Mr. Williams's text messages were improperly admitted pursuant to Federal Rule of Evidence 801(d)(2)(E), the co-conspirator exception to the hearsay rule."  Motion at 15.  Defendant argues this Court "must grant a new trial if trial error had a substantial influence on the verdict." *Id.* at 13 (quoting *United States v. Quiles*, No. CRIM. A. 07-391-01, 2008 WL 3561618, at *3 (E.D. Pa. Aug. 13, 2008)).  According to Defendant, "a new trial is warranted to correct

th[e] manifest injustice" of erroneously admitting Mr. Williams' text messages. *Id.* at 18.

Under Rule 801(d)(2)(E), a statement that "is offered against an opposing party and … was made by the party's coconspirator during and in furtherance of the conspiracy" is excluded from the definition of hearsay. Fed. R. Evid. 801(d)(2)(E). To demonstrate that a statement fits into this exclusion, the Government must show "by a preponderance of the evidence that: (1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." *United States v. Turner*, 718 F.3d 226, 231 (3d Cir. 2013). A coconspirator statement "must be considered but does not by itself establish … the existence of the conspiracy or participation in it under (E)." Fed. R. Evid. 801(d). In other words, the Government "may rely on the co-conspirator's statements themselves, if they are corroborated by independent evidence." *Turner*, 718 F.3d at 231 (citations omitted).

Here, the Government carried its burden of demonstrating by a preponderance of the evidence that a conspiracy existed between Defendant and Mr. Williams, and that the statements in question were made in the course of and in furtherance of that conspiracy. This Court made the same determination during trial in response to Defendant's objection to the admission of the messages:

> [B]ased on the evidence that has been presented so far and from the Court's review of the text messages from [Defendant]—by a preponderance of the evidence, there is a conspiracy—the Court finds there is a conspiracy of which both the declarant and—both [Defendant]

9

> and Mr. Williams were involved, that statements were made in the course of that conspiracy, and that both statements, [Defendant's] and Mr. Williams' statements, in furtherance of the conspiracy are admissible.

Tr. 4 at 31:19–32:6.

As detailed above, Defendant and Mr. Williams discussed past robberies in the messages and coordinated their plans for future robberies. Additionally, the existence of the conspiracy was corroborated by independent evidence. For example, there was video evidence and witness testimony suggesting that two people matching Defendant and Mr. Williams' description were committing the robberies. There was clothing recovered from Defendant's home matching the clothing worn by Mr. Williams' accomplice during the incidents, as well as the photographs from Defendant's phone showing a similar connection. There was also the cell site data placing Defendant and Mr. Williams in the same areas on the days of the charged offenses.

Taken together, this was enough to prove the existence of a conspiracy by a preponderance of the evidence. The text messages were therefore properly admitted, and there is no reason to grant a new trial on this basis.

### 3. Voir Dire Process

Defendant's final argument is that "the Court's method and restrictions employed during voir dire were constitutionally and procedurally inadequate" because both the "process and limits on follow-up questions failed to sufficiently 'ferret out' potential juror bias, preventing counsel from developing the factual basis necessary to intelligently exercise peremptory strikes." Motion at 18. Defendant

faults the Court for "employing a 'show of hands' method[,]" where the "venire sat together as one, large group while the Court asked questions" while a "prospective juror signaled their agreement, or disagreement, with the Court's questions in open court by raising a paper with their juror number." *Id.* at 20.

In particular, Defendant raises concerns with the following decisions: The Court excused Juror Number 1 for cause because "raised her card that someone in her family was charged with a crime, and as a result, she cannot be fair and she would not be able to keep bias or prejudice outside of her determination." *Id.* at 23. The Court excused Juror Number 15 for cause because she said she was "less likely to believe a police officer because of his or her job[.]" *Id.* The Court denied several defense requests to further question some jurors who were familiar with certain places connected to the crimes, or who knew law enforcement personnel or victims of crime, but who nevertheless indicated they could be impartial. *See id.* at 24–25.

Lastly, Defendant avers the Court sat "two potentially unfit jurors." *Id.* at 25. The first, Juror Number 12, was overheard by the defense investigator saying, "You've got to be fucking kidding me" when he was selected. *Id.* The second, the juror in seat 7, appeared to be sleeping for part of the trial. *See id.* at 26–27.

Turning to the governing law, "[v]oir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991). "The trial court's duty to seat an impartial jury requires that it test prospective jurors for actual bias and strike for cause those persons who will not be able to impartially

11

follow the court's instructions." *Butler v. City of Camden, City Hall*, 352 F.3d 811, 814–15 (3d Cir. 2003) (citations and quotation marks omitted).  In fulfilling this responsibility, the "trial judge is necessarily vested with broad discretion in determining the manner and scope of the questioning." *Id.* at 815 (citation omitted). Indeed, the trial court's broad discretion is "well established under federal case law, and an abuse of discretion will only be found where the district court's *voir dire* examination is so general that it does not adequately probe the possibility of prejudice." *Id.* (citations and quotation marks omitted).

Against this legal backdrop, Defendant's claims do not have merit.  This Court had broad discretion over the questions asked during voir dire, and Defendant's own examples demonstrate that the method employed by the Court was adequate to detect juror bias.  Furthermore, this method (asking questions of the entire panel and instructing prospective jurors to indicate their response by raising a numbered card) is a customary process for jury selection.  *See, e.g.*, *Gov't of Virgin Islands v. Felix*, 569 F.2d 1274, 1276–77 (3d Cir. 1978); *United States v. Ballard*, No. CR 15-180-10, 2018 WL 6252604, at \*14 (E.D. Pa. Nov. 29, 2018).

Finally, Defendant's contentions about the "two potentially unfit jurors[,]" Motion at 25, does not justify granting a new trial.  Although Juror Number 12 expressed initial displeasure at being selected, there was no indication that he was unable to be fair and impartial.  As this Court explained at the time, "lots of people don't want to serve on a jury.  It's whether or not they can be fair and impartial.  So the fact that he's disappointed about getting selected is not something that makes

him unable to be fair." Tr. 1 at 87:20–23. There was no further concern expressed about this juror.

When defense counsel addressed with the Court the juror who appeared to be sleeping, the Court responded that it would be best to question her before replacing her with an alternate:

> I would not dismiss her without questioning her. There are times when I look at her that I'm unsure if she is asleep or looking down taking notes, and I just can't tell from my vantage point. If there are parts of the testimony that she has missed, then that is a concern, and we should replace her, but I would question her first.

Tr. 2 at 147:23–148:3. The Court then suggested watching the juror for the rest of the day and replacing her if necessary at the end of the day. *See* Tr. 2 148:6–10. Defense counsel agreed with that plan. *See* Tr. 2 at 148:11–12.

When the Court questioned the juror at the end of the day, she conceded that she may have dozed off a little. However, when asked if she had any concerns that she had not gotten the full breadth of the case, she replied, "Absolutely not. I'm confident that I'm following this." Tr. 2 at 267:2–268:1. After the juror had left, the Court expressed a willingness to hear any motions. Defense counsel stated, "I won't make a motion at this time based on the questions that you posed and her answers. … I'll raise it again in the future if I think that's necessary." Tr. 2 at 268:18–269:1. The Court added, "Fortunately, we have two alternates here that are being completely attentive, and if we need to substitute someone, we will collectively address that." Tr. 2 at 269:2–4. There was no subsequent motion to remove the juror.

In sum, neither the limitations on questioning, the method of jury selection, nor the two potentially unfit jurors present a problem that necessitates granting a new trial.

## III.    Conclusion

For the preceding reasons, Defendant's arguments do not merit the relief he seeks.  Accordingly, this Court properly denied his Motion.


**DATED: June 17, 2026**                    **BY THE COURT:**

_____

**GAIL A. WEILHEIMER, J.**